# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

NOE JUAREZ,

     Applicant,

v.                                         CASE NO. 8:14-cv-65-SDM-TGW

SECRETARY, Department of Corrections,

     Respondent.

_____/

## **ORDER**

Juarez applies under 28 U.S.C. § 2254 for a writ of habeas corpus (Doc. 1) and challenges his convictions for manslaughter, driving under the influence, driving with a suspended license, and giving false information to a law enforcement officer, for which Juarez is imprisoned for twenty years.  Numerous exhibits ("Respondent's Exhibit ___") support the response.  (Doc. 15)  The respondent concedes the application's timeliness (Doc. 15 at 12) but argues that some grounds are procedurally barred.  (Doc. 15 at 19, 21)

## I. **BACKGROUND**[1]

On April 17, 2007, Tara Unger traveled from North Port to Tampa to pick up her husband.  During Unger's return to North Port, Juarez's car crashed into Unger's car, killing Unger's husband and seriously and permanently injuring Unger.

_____

[1] This summary of the facts derives from the briefs on direct appeal. (Respondent's Exhibits 15 and 16).

A highway patrol trooper found Juarez's car about a quarter of a mile from Unger's car. The trooper found Juarez about seventy-five feet from his car in a wooded area with cuts on both his head and his finger. A horizontal gaze nystagmus test suggested that Juarez was intoxicated, and a forensic toxicologist determined that when the crash occurred Juarez's blood alcohol level was between 0.139 and 0.140. Four unopened beer bottles, an empty beer bottle, a broken beer bottle, and beer bottle caps appeared on the floor of the front passenger seat in Juarez's car. Based on tire marks at the scene, a highway patrol corporal determined that Juarez's car struck the left rear bumper of Unger's car and caused Unger's car to flip. The impact ejected Unger from the car and hurled her over one hundred feet.

After waiving his *Miranda* rights, Juarez admitted that he was driving but claimed that Unger suddenly swerved her car in front of his car and caused the crash. Juarez further claimed that earlier that day he drank only two bottles of beer.

## II. EXHAUSTION AND PROCEDURAL DEFAULT

The respondent argues that ground two and ground three in the application are procedurally barred from federal review because Juarez failed to exhaust the claims. (Doc. 15 at 19–22) "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including

a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (citing *Henry*, 513 U.S. at 365–66).

## Ground Two:

Juarez asserts that the trial court violated his federal right to a fair trial by denying his motion to prohibit the jurors from viewing a monument at the courthouse dedicated to the victims of crimes. (Doc. 1 at 6) The respondent argues the claim is unexhausted because Juarez presented the claim on direct appeal under state law and not as the violation of a federally protected right. (Doc. 15 at 19–20) However, on direct appeal, Juarez asserted that the trial court violated "the right to a fair trial guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." (Respondent's Exhibit 15 at 44) Consequently, ground two is exhausted.

## Ground Three:

Juarez asserts that trial counsel deficiently performed by advising him not to testify at trial. (Doc. 1 at 7) The respondent argues that the claim is unexhausted because in his motion for post-conviction relief Juarez did not allege that trial counsel advised him not to testify. (Doc. 15 at 22) In his motion for post-conviction relief Juarez alleged that "[c]ounsel told him that his language barrier would not appeal to the jury, and [the jury] may misunderstand some of his factual testimony and find him guilty." (Respondent's Exhibit 18 at 3) Juarez alleged that "[he] did not testify — only because of misadvice of counsel." (Respondent's Exhibit 18 at 5)

Because in the motion for post-conviction relief Juarez alleged that trial counsel advised him not to testify, ground three is exhausted. *Kelley v. Sec'y, Dep't Corrs.*, 377 F.3d 1317, 1344 (11th Cir. 2004) ("We recognize that habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance.").

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 governs this proceeding. *Wilcox v. Fla. Dep't Corrs.*, 158 F.3d 1209, 1210 (11th Cir. 1998). Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), explains this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. . . . Under the "contrary to" clause, a federal habeas court may grant the writ if the state court

arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' and 'highly deferential standard for evaluating

state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]'") (citations omitted).

When the last state court to decide a federal claim issues an explanatory and reasoned opinion, a federal habeas court reviews the specific reasons in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). When the relevant state-court decision is not accompanied with reasons for the decision, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. A respondent may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Wilson*, 584 U.S. at 125–26.

In *per curiam* decisions without a written opinion the state appellate court affirmed the denial of Juarez's federal claims on direct appeal and the denial of his Rule 3.850 motion. (Respondent's Exhibits 17 and 24) A state appellate court's *per curiam* decision without a written opinion warrants deference under Section 2254(d)(1). *Wright v. Sec'y, Dep't Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002). *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

As *Pinholster* explains, 563 U.S. at 181–82, review of the state court decision is limited to the state court record:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court.

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Juarez bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001). Juarez's federal application presents the same grounds that he presented to the state court. The state court's rejection of Juarez's claims warrants deference in this federal action. (Respondent's Exhibits 5, 19, and 22)

## IV.  ISSUES ON DIRECT APPEAL

**Ground One:**

Juarez asserts that the trial court unreasonably applied *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Kastigar v. United States*, 406 U.S. 441 (1972), by denying his motion to suppress his statements to a police officer at the scene of the crash. (Doc. 1 at 4–5) The trial court denied the claim as follows (Respondent's Exhibit 5 at 1–5):

This matter is before the court on Defendant's motion to suppress statements filed pursuant to Florida Rule of Criminal Procedure 3.190(i) [and] Motion to Suppress Physical Evidence and Statements [in] violation of international treaties pursuant to Florida Rule of Criminal Procedure 3.190(h). The court held hearings on the Defendant's motions on April 15, 2008, and May 7, 2008. The court has carefully considered the motion, testimony introduced at the evidentiary hearing, argument of counsel, reviewed the court file, and is otherwise duly advised in the premises.

The court heard testimony from five witnesses at the hearing. Trooper George Yock, fire paramedic Kristi Halvorson, North Port Police Officer Curry, Florida Highway Patrol Corporal David Staley, along with the Defendant, Mr. Juarez, testified.

After a careful review of the testimony and the law, the court finds that the Defendant's motions should be denied. First, with respect to the Defendant's motion to suppress statements, the court finds that the Defendant's claim that his statements were not voluntary and intelligent because he did not have sufficient understanding of the English language is without merit. All the credible testimony established that the Defendant, although his command of the English language does not qualify him as fluent in English, could understand English and answer questions sufficiently in English. Specifically, Trooper Yock testified that the Defendant told him that he had dropped his wife off at work prior to the accident, and Ms. Halvorson testified that the Defendant understood and appropriately answered several health-related questions regarding the pain in his head and the cut on his finger. Additionally, Ms. Halvorson testified that if there was a serious language barrier with the Defendant, she would have noted that in her report, which she testified she did not. Additionally, the court would note that during the Defendant's own testimony, it appeared to the court that the Defendant had a selective understanding of English and, therefore, his testimony regarding his lack of understanding of the *Miranda* warnings and the waiver of his rights appears not to be credible.

. . .

Finally, the court rejects the Defendant's claim that Corporal Staley employed the question first method condemned in *Missouri v. Seibert*, 542 U.S. 600 (2004), as the record does not reflect that Corporal Staley's interrogation was calculated to

undermine the *Miranda* warning. *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).

*Miranda*, 384 U.S. at 444, holds that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Before any questioning, the defendant must be informed that he has the right to remain silent, his statement can be used as evidence against him, and he has the right to have a retained or appointed attorney present. *Miranda*, 384 U.S. at 444–45. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. If the defendant indicates that either he wants to consult an attorney or that he does not want to participate in an interrogation, police must not question him. *Miranda*, 384 U.S. at 444–45.

**Statements to Trooper George Yock**

Trooper Yock testified that he arrived at the scene of the crash, found Juarez's car about a quarter mile away from Unger's car, and observed Juarez lying in a fetal position next to a tree in woods about one hundred feet from his car. (Respondent's Exhibit 3 at 11–14) Before directing Juarez to come out of the woods and show his hands, Trooper Yock unholstered and pointed his gun to the ground. (Respondent's Exhibit 3 at 13–14) After Juarez complied, Trooper Yock returned the gun to the holster. (Respondent's Exhibit 3 at 13–14) Trooper Yock, who was responsible for investigating the crash, patted Juarez's clothes to check for weapons and asked

Juarez questions related to his investigation. (Respondent's Exhibit 3 at 17) Also, Trooper Yock followed the ambulance that drove Juarez to the hospital and asked Juarez questions about his identity after paramedics secured Juarez's body to a stretcher. (Respondent's Exhibit 3 at 24–25)

Because Trooper Yock neither handcuffed Juarez nor unholstered his gun during questioning and only temporarily detained Juarez to investigate the crash, the trooper's interrogation of Juarez without informing him of his rights did not violate *Miranda*. *Pennsylvania v. Bruder*, 488 U.S. 9, 10 (1988) ("[T]he 'noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*.'") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). *California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.") (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) ("Several courts have ruled that an initial display of guns, subsequently reholstered, does not result in 'custody' that requires *Miranda* warnings.") (citing *United States v. Jones*, 21 F.3d 165, 170 (7th Cir. 1994), *United States v. Gregory*, 891 F.2d 732, 735 (9th Cir. 1989), and *United States v. Manbeck*, 744 F.2d 360, 372 (4th Cir. 1984)).

### Statements to Corporal David Staley

Corporal Staley, a traffic homicide investigator, arrived at the scene of the crash around 2:00 A.M. and spoke with Juarez around 5:25 A.M. (Respondent's

Exhibit 4 at 4–5)  Corporal Staley used a printed form to advise Juarez of his *Miranda* rights, and Juarez responded that he understood his rights.  (Respondent's Exhibit 4 at 6–7)  Corporal Staley read each right again, supplemented his second recitation of each right with short and simple words in English to convey the meaning of each right,  and confirmed that Juarez understood each right.  (Respondent's Exhibit 4 at 7–9)  After acknowledging that he understood each right, Juarez agreed to speak with Corporal Staley.  (Respondent's Exhibit 4 at 8–9)  Juarez never claimed that he did not speak English or that he did not understand the rights.  (Respondent's Exhibit 4 at 9)  After waiving his *Miranda* rights, Juarez explained in detail how the crash occurred.  (Respondent's Exhibit 4 at 10)

Juarez, who was twenty-two, testified that he was born in Mexico and had lived in the United States for fifteen years.  (Respondent's Exhibit 4 at 25–26)  Juarez denied understanding his *Miranda* rights and claimed that he asked Corporal Staley for an interpreter.  (Respondent's Exhibit 4 at 26–27)

The post-conviction court determined that Juarez did not credibly testify about his inability to understand the *Miranda* rights and the consequences of waiving his rights, and a post-conviction court's credibility determination receives deference in federal court.  *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016) ("'Federal habeas courts have no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'") (quoting *Consalvo v. Sec'y, Dep't Corrs.*, 664 F.3d 842, 845 (11th Cir. 2011)).

Trooper Yock testified that Juarez understood English.  (Respondent's Exhibit 3 at 12–13)  Juarez complied with the trooper's directions, denied that he possessed a weapon, gave the trooper permission to pat his clothing, told the trooper his name, and told the trooper that he kept his identification in his wallet.  (Respondent's Exhibit 3 at 13–14)  The trooper used short and simple words in English, and Juarez understood.  (Respondent's Exhibit 3 at 15, 19)  Juarez told the trooper that he drove his wife to work, remained in the outside lane of the highway when returning home, and swerved when he saw lights.  (Respondent's Exhibit 3 at 16–17)  Juarez complied with the trooper's instructions when the trooper administered a horizontal gaze nystagmus test.  (Respondent's Exhibit 3 at 34–36)

Also, Kristi Halvorson, a paramedic, testified that Juarez understood English.  (Respondent's Exhibit 3 at 53)  Juarez spoke with a strong accent but understood questions in English and responded appropriately.  (Respondent's Exhibit 3 at 53)  Juarez told the paramedic about a cut on his finger and a painful bump on the back of his head.  (Respondent's Exhibit 3 at 54–55)  Juarez denied feeling dizzy or weak, denied suffering from shortness of breath, denied pain in his chest or abdomen, and denied blurred vision, numbness, and experiencing a loss of consciousness.  (Respondent's Exhibit 3 at 55–63)  Juarez took deep breaths when the paramedic listened to his lungs and squeezed the paramedic's hands when the paramedic tested his strength.  (Respondent's Exhibit 3 at 57–58)  Juarez stated that he did not understand only when the paramedic asked why he walked into the woods after the crash.  (Respondent's Exhibit 3 at 63–64)

Because Corporal Staley informed Juarez of his *Miranda* rights in English, because Juarez told Corporal Staley that he understood those rights, and because the record demonstrates that Juarez understood and spoke English, the post-conviction court did not unreasonably apply *Miranda* by determining that Juarez knowingly and voluntarily waived his rights.

**Kastigar**

Juarez asserts that the trial court unreasonably applied *Kastigar*.  (Doc. 1 at 5) *Kastigar*, 406 U.S. at 442, addressed:

> [W]hether the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony.

In *Kastigar*, 406 U.S. at 442, 448–49, the defendants, who invoked their Fifth Amendment right against self-incrimination, refused to testify before a grand jury after a prosecutor offered use and derivative use immunity.  *Kastigar*, 406 U.S. at 453, held that "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege."

In his motion to suppress, Juarez asserted that police violated his Fifth Amendment right against self-incrimination by both compelling him, under Section 316.062, Florida Statutes, to provide information concerning the crash and interrogating him without advising him of his *Miranda* rights.  (Respondent's Exhibit 2 at 4–5)  In the order denying the motion, the trial court failed to rule on the

compulsion claim based on Section 316.062 and instead ruled only on the claim

based on *Miranda*.  (Respondent's Exhibit 5)

However, at trial, trial counsel renewed the compulsion claim, and the trial

court denied the claim as follows (Respondent's Exhibit 8 at 328–29):

| [Trial counsel:] | At this time, Your Honor, I'm going to make, with the Court's permission, a continuing objection to all statements that Mr. Juarez is alleged to have made based on my previously filed motions including, Your Honor, the fact that my position is this is accident report privilege and I don't think there's been — it's been established that he left the scene. I don't think it's been established to the degree that these incriminating statements that he's — that they cannot be used against him under the accident report privilege [and] come in. |
|---|---|
| [Prosecutor:] | Your Honor, the case law which defense counsel has had an opportunity to argue on motions to suppress, which have been denied — the case law is clear that your accident report privilege is waived if you leave the scene of a [crash]. I didn't bring the case law here today because I didn't think that this was going to be an issue since we had already had our hearings. |
| [Trial court:] | When did you previously raise that issue? |
| [Trial counsel:] | In my written motion I did. |
| [Prosecutor:] | Your Honor's prior ruling was, all his statements come in. |
| [Trial court:] | All right. I'm going to allow the continuing objection but I'll overrule your objection. |
| [Prosecutor:] | Thank you, Judge. |

Because the trial court adjudicated the claim on the merits, Juarez must demonstrate that the trial court either ruled contrary to or unreasonably applied "clearly established federal law as determined by the United States Supreme Court." 28 U.S.C. § 2254(d)(1). "'[C]learly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Jennings v. Sec'y, Fla. Dep't Corrs.*, 55 F.4th 1277, 1292 (11th Cir. 2022) (quoting *Williams*, 529 U.S. at 412).

Section 316.066(4), Florida Statutes, bars at trial the admission of a statement by a person to a law enforcement officer who is writing a crash report:

> Except as specified in this subsection, each crash report made by a person involved in a crash and any statement made by such person to a law enforcement officer for the purpose of completing a crash report required by this section shall be without prejudice to the individual so reporting. Such report or statement may not be used as evidence in any trial, civil or criminal. However, subject to the applicable rules of evidence, a law enforcement officer at a criminal trial may testify as to any statement made to the officer by the person involved in the crash if that person's privilege against self-incrimination is not violated. . . .

*State v. Cino*, 931 So. 2d 164, 168 (Fla. 5th DCA 2006), explains that the privilege under Section 316.066(4) is coextensive with the Fifth Amendment right against self-incrimination:

> The State also argues that the circuit court erred in holding that section 316.066(4) bars the State from using Cino's compelled statements against him during its investigation, or at any pretrial proceeding. This point merits additional discussion. The State is correct that the statute only expressly bars the State from using Cino's compelled statements "at trial." However, the Constitution prohibits the State from making any use of Cino's compelled statements against him, either directly or derivatively. *See Kastigar v. United States*, 406 U.S. 441 (1972).

> The purpose of the Section 316.066(4) accident report privilege is to ensure that the state does not violate an individual's constitutional privilege against self-incrimination when he or she is compelled to truthfully report to law enforcement the facts surrounding an automobile accident. *See Brackin v. Boles*, 452 So. 2d 540, 544 (Fla. 1984). Consequently, our Supreme Court has held that the statute "clothe[s] with statutory immunity only such statements and communications as the driver, owner, or occupant of a vehicle is compelled to make in order to comply with his or her statutory duty under Section 316.066(1) and (2)." *Id.* Similarly, we believe it is obvious that the protection provided by Section 316.006(4) must be read as co-extensive with the constitutional privilege against self-incrimination. In other words, when the driver, owner or occupant of a vehicle is compelled to make statements in order to comply with his or her statutory duty, the immunity provided by Section 316.006(4) is equivalent to that required by the Fifth Amendment. *See Tyne v. Time Warner Entm't Co.*, 901 So. 2d 802, 810 (Fla. 2005) (noting that courts have "an obligation to give a statute a constitutional construction where such a construction is possible"). For this reason, we believe that the accident report privilege must be read as having barred law enforcement from making any use of statements compelled from Cino, as part of its accident investigation, that would violate Cino's privilege against self-incrimination.

Trooper Yock testified that he arrived at the scene of the crash, found Juarez's car about a quarter mile away from Unger's car, and observed Juarez lying in a fetal position and hiding behind a small tree in woods about one hundred feet from his car. (Respondent's Exhibit 3 at 11–14) The trial court denied Juarez's motion to suppress his statements to Trooper Yock during the traffic investigation because Juarez left the scene of the crash. *Williams v. State*, 208 So. 3d 196, 197 (Fla. 3d DCA 2016) ("[T]he accident privilege in section 316.066(4) does not confer any benefit or privilege on a person who abandons her duty to remain at the scene of any automobile accident which results in death, and who chooses instead to leave the

scene of an accident . . . .") (citing *Cummings v. State*, 780 So. 2d 149 (Fla. 2d DCA 2000)).

*White v. Woodall*, 572 U.S. 415, 426–27 (2014), clarifies that Section 2254(d)(1) does not require a state court to extend a holding by the United States Supreme Court to new facts:

> [T]his Court has never adopted the unreasonable-refusal-to-extend rule on which respondent relies. It has not been so much as endorsed in a majority opinion, let alone relied on as a basis for granting habeas relief. To the extent the unreasonable-refusal-to-extend rule differs from the one embraced in *Williams* and reiterated many times since, we reject it. Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. *See* Scheidegger, *Habeas Corpus, Relitigation, and the Legislative Power*, 98 Colum. L. Rev. 888, 949 (1998). Thus, "if a habeas court must extend a rationale before it can apply to the facts at hand," then by definition the rationale was not "clearly established at the time of the state-court decision." *Yarborough*, 541 U.S. at 666. AEDPA's carefully constructed framework "would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law." *Ibid.*
>
> This is not to say that § 2254(d)(1) requires an "'identical factual pattern before a legal rule must be applied.'" *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). To the contrary, state courts must reasonably apply the rules "squarely established" by this Court's holdings to the facts of each case. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). "[T]he difference between applying a rule and extending it is not always clear," but "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Yarborough*, [541 U.S.] at 666. The critical point is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no "fairminded disagreement" on the question, *Harrington*, 562 U.S. at [103].

Because *Kastigar* does not address whether unlawful conduct waives statutory immunity, the trial court neither ruled contrary to nor unreasonably applied the opinion. *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1304 (11th Cir. 2019) ("A state court's decision cannot be contrary to, or involve an unreasonable application of, 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1), unless there is a Supreme Court decision on point."). Ground one is denied.

**Ground Two:**

Juarez asserts that the trial court denied his federal right to a fair trial by denying his motion to prohibit the jurors from viewing a monument outside the courthouse dedicated to victims of crime.  (Doc. 1 at 6)  Before trial, the trial court acknowledged an earlier ruling on Juarez's motion (Respondent's Exhibit 8 at 15–16):

|  |  |
|---|---|
| [Trial counsel:] | Your Honor, just three matters. Number one, I don't know if the court has actually issued a written order regarding the victim's monument motion that we addressed on May 5th. |
| [Trial court:] | I don't know. I think I did it on one case. |
| [Trial counsel:] | It was on Haas, and then I think the court was going to go ahead and include Noe Juarez. |
| [Trial court:] | I will go ahead and do that. I denied the motion, but I will go ahead and enter a written order, but for the record at this point, I will just say this, that it is denied. |

The trial court's written order[2] denying the motion contains no reasons:

> This matter is before the court on Defendant's Motion in
> Limine to Prevent Juror Contact with "Victims' Monument."
> The court held a hearing on the Defendant's motion on May 7,
> 2008. The court has carefully considered the motion, argument
> of counsel, reviewed the court file, and is otherwise duly
> advised in the premises.
>
> The Defendant's motion is denied for the reasons given in open
> court on the record.

A transcript of the hearing on May 7, 2008, contains no ruling on the motion.

(Respondent's Exhibit 4)  Because the record demonstrates that the trial court

adjudicated the motion on the merits but contains no reasons for the ruling, Juarez

must demonstrate that no reasonable basis supports the denial of relief. *Richter*,

562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation,

the habeas petitioner's burden still must be met by showing there was no reasonable

basis for the state court to deny relief.").

Juarez's motion to prohibit the jurors from viewing the monument alleged the

following facts (Respondent's Exhibit 6 at 1–2):

> The Defendant is charged with aggravated DUI manslaughter
> and DUI with serious bodily injury. Approximately eight years
> ago, the monument was placed in front of the courthouse where
> the Defendant's trial is scheduled to take place. The monument
> is within several feet of the steps to the courthouse.
>
> The monument consists of a magnolia tree. Under the tree is a
> large stone and metal plaque with the inscription:
>
>> "Justice will only be achieved when those who
>> are not injured by crime feel as indignant as those
>> who are."

---

[2] *See* Order Denying Defendant's Motion in Limine to Prevent Juror Contact with "Victims'
Monument," *State v. Juarez*, No. 07-CF-7715 (Fla. 12th Jud. Cir. May 19, 2008).

The inscription credits the quote to Solomon.

Individuals are able to place messages inscribed in bricks that surround the tree and stone. The vast majority of the numerous messages on the bricks concern the subject of deceased friends or family members. Several of the messages on the bricks contain the names of decedents in highly publicized local murder cases. Several of the messages contain statements of family members missing the deceased individuals.

Three benches are directly next to the monument. The benches surround the monument on three sides. The benches face the monument. At least one of the benches has an ashtray next to it.

The monument and the area directly next to the monument [are] well known as a regular gathering place for jurors and prospective jurors who are called to service at the courthouse — especially those jurors and prospective jurors who smoke. The monument is positioned in such a way that a large amount of foot traffic entering the courthouse must travel very close the monument.

At a hearing, trial counsel introduced into evidence photographs of the magnolia tree, the plaque, the benches, and the bricks.  (Respondent's Exhibit 7)

"Due process requires that the accused receive a trial by an impartial jury free from outside influences."  *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).  However, "since 'it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote . . . due process does not require a new trial every time a juror has been placed in a potentially compromising situation.'"  *United States v. Rowe*, 906 F.2d 654, 656 (11th Cir. 1990) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).  "To establish a violation of his right to a fair trial, [the defendant] initially 'ha[s] the burden of making a colorable showing that [jury] exposure ha[d],

in fact, occurred.'" *United States v. Alexander*, 782 F.3d 1251, 1258 (11th Cir. 2015) (quoting *United States v. Siegelman*, 640 F.3d 1159, 1182 (11th Cir. 2011)).

Because Juarez failed to demonstrate that a juror visited the monument and that prejudice resulted from the visit, the trial court did not unreasonably deny the fair trial claim. *Rowe*, 906 F.2d at 656 ("Prejudice is not presumed.  The defendant has the burden of demonstrating prejudice by a preponderance of credible evidence. 'Such prejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations.'") (citation omitted).  Ground two is denied.

## V.  INEFFECTIVE ASSISTANCE OF COUNSEL

Juarez claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*,
>
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient

> performance prejudiced the defense. This
> requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

"There is no reason for a court deciding an ineffective assistance claim . . .
to address both components of the inquiry if the defendant makes an insufficient
showing on one." *Strickland*, 466 U.S. at 697.  "[C]ounsel is strongly presumed to
have rendered adequate assistance and made all significant decisions in the exercise
of reasonable professional judgment."  466 U.S. at 690.  "[A] court deciding an
actual ineffectiveness claim must judge the reasonableness of counsel's challenged
conduct on the facts of the particular case, viewed as of the time of counsel's
conduct."  466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances,
the identified acts or omissions were outside the wide range of professionally
competent assistance."  466 U.S. at 690.

Juarez must demonstrate that counsel's alleged error prejudiced the defense
because "[a]n error by counsel, even if professionally unreasonable, does not warrant
setting aside the judgment of a criminal proceeding if the error had no effect on the
judgment." *Strickland*, 466 U.S. at 691.  To meet this burden, Juarez must show
"a reasonable probability that, but for counsel's unprofessional errors, the result of
the proceeding would have been different.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Juarez cannot meet his burden by showing that the avenue chosen by counsel
proved unsuccessful.  *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).
*Strickland* cautions that "strategic choices made after thorough investigation of law

and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

Sustaining a claim of ineffective assistance of counsel under Section 2254(d) is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. *Nance*, 922 F.3d at 1303 ("Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'") (quoting *Johnson v. Sec'y, Dep't Corrs.*, 643 F.3d 907, 911 (11th Cir. 2011)).

Because the state court rejected the grounds based on *Strickland*, Juarez cannot meet the "contrary to" test in Section 2254(d)(1). (Respondent's Exhibits 19 and 22) Juarez instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact. In determining "reasonableness," Section 2254(d) authorizes determining only "whether the state habeas court was objectively reasonable in its *Strickland* inquiry" and not independently assessing whether counsel's actions were reasonable. *Putman v. Head*, 268 F.3d 1223, 1244 n.17 (11th Cir. 2001). The presumption of correctness and the highly deferential standard of review require that the analysis of each ground begin with the state court's analysis.

## A. <u>Grounds of IAC Before and During Trial</u>

**<u>Ground Three:</u>**

Juarez asserts that trial counsel deficiently performed by advising him not to testify at trial.  (Doc. 1 at 7)  The post-conviction court denied the claim as follows (Respondent's Exhibit 22 at 2):

> [T]he Defendant claims that trial counsel was ineffective by advising the Defendant not to testify at trial because of his language barrier. The Defendant claims that he was prejudiced because his testimony was the only testimony that could have refuted the testimony of law enforcement. The Defendant acknowledges on page four of the motion that the decision not [to] testify at trial was his. Trial counsel did not advise the Defendant not to testify. Rather, trial counsel simply made the Defendant aware of how the jury might react to certain circumstances. Therefore, the claim is denied.

At trial, the trial judge determined that Juarez knowingly and voluntarily waived his right to testify (Respondent's Exhibit 8 at 688–89)[3]:

| [Court:] | All right. Mr. Juarez, I need to ask you some questions. You have indicated to your attorney, and your lawyer has indicated to me that you will not be testifying in this case, is that correct? |
|---|---|
| [Juarez:] | Yes. |
| [Court:] | Is that your decision? |
| [Juarez:] | Yes. |
| [Court:] | You do understand that, under the law, you do have the right to testify if you wish. Do you understand that, sir? |
| [Juarez:] | Yes. |

---

[3] At trial, the trial court provided Juarez the assistance of an interpreter. (Respondent's Exhibit 8 at 9–10, 117–18, 237, 739–40)

| | |
|---|---|
| [Court:] | You also have the right not to testify if you so choose. |
| [Juarez:] | Yes. |
| [Court:] | And that is a decision that only you can make, but you may ask your lawyer or lawyers their opinions and get assistance from them as well. Do you understand that, sir? |
| [Juarez:] | Yes. |
| [Court:] | Have you discussed this matter with your attorney? |
| [Juarez:] | Yes. |
| [Court:] | And have you thought about the fact that you will not be judged upon it? |
| [Juarez:] | Yes. |
| [Court:] | And it is your decision, sir, not to testify? |
| [Juarez:] | Yes, sir. |
| [Court:] | No one has pressured you in any way to make you make this decision? |
| [Juarez:] | No. |
| [Court:] | And you are doing so on your own free will, sir? |
| [Juarez:] | Yes. |
| [Court:] | All right, sir. Thank you, sir. |

Because Juarez acknowledged that he chose not to testify after consulting with trial counsel, the post-conviction court did not unreasonably determine that "trial counsel did not advise [Juarez] not to testify" and that "trial counsel simply

made the Defendant aware of how the jury might react to certain circumstances."
(Respondent's Exhibit 19 at 2)

Because Juarez failed to demonstrate that no competent counsel would advise
Juarez not to testify because he does not fluently speak English, the post-conviction
court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 690 ("[C]ounsel
is strongly presumed to have rendered adequate assistance and made all significant
decisions in the exercise of reasonable professional judgment."); *Chandler v. United
States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is
presumed reasonable, for a petitioner to show that the conduct was unreasonable,
a petitioner must establish that no competent counsel would have taken the action
that his counsel did take.").

Also, in his motion for post-conviction relief, Juarez contended as follows that
he would have testified (Respondent's Exhibit 18 at 3–4):

> Mr. Juarez wanted to testify and tell the jury that the accident
> was not his fault; he was not impaired by alcohol, and he never
> fled the scene. Mr. Juarez wanted to tell the jury that he was
> temporarily incoherent and shocked by the traumatic events of
> the crash. Mr. Juarez wanted to tell the jury that the testimony
> of law enforcement had errors, inconsistencies, and some of it
> was false, fabricated lies. Mr. Juarez wanted to testify that
> "yes," the accident was tragic, "yes," his car was involved, but
> the accident was dramatically different [than what] the law
> enforcement reconstructionist testified to. "It was an
> 'accident.'"
>
> . . .
>
> Mr. Juarez wanted to testify and tell the jury that [Unger's]
> vehicle made an erratic move that impeded him and caus[ed]
> the accident. Mr. Juarez could have testified to numerous facts
> and events that would have changed the outcome of his trial.

A paramedic drew blood from Juarez at the scene of the crash. (Respondent's Exhibit 8 at 344–46, 399–403) A forensic toxicologist determined that when the crash occurred Juarez's blood contained an alcohol level between 0.139 and 0.140. (Respondent's Exhibit 8 at 583–84) This expert testimony based on physical evidence rebuts Juarez's proposed self-serving testimony that he was not intoxicated when the crash occurred.

A trooper testified that he discovered Juarez's car about a quarter of a mile down the road from Unger's car and observed damage to the front of the car. (Respondent's Exhibit 8 at 321–23) The trooper walked about seventy to one hundred feet from Juarez's car to a trail that led to woods and observed Juarez about five feet into the woods lying down in a fetal position at the base of a tree. (Respondent's Exhibit 8 at 325–27) Both the location of Juarez's car about a quarter of a mile down the road from Unger's car and the trooper's discovery of Juarez lying down in the woods rebut Juarez's proposed testimony that he did not flee from the scene of the crash.[4]

Lastly, the jury found Juarez guilty of manslaughter while driving under the influence. (Respondent's Exhibit 9) "The statutory offense of DUI manslaughter requires proof that the defendant was operating a vehicle while legally impaired and that the defendant's operation of the vehicle caused or contributed to the death of the victim." *Jones v. State*, 297 So. 3d 685, 687 (Fla. 1st DCA 2020). "[T]he driver's

---

[4] In his motion for post-conviction relief, Juarez failed to identify the "errors, inconsistencies, [and] false, fabricated lies" by law enforcement officers who testified at trial. (Respondent's Exhibit 18 at 3–5)

conduct need not be the sole cause of the victim's death to support a conviction for DUI manslaughter." *Jones*, 297 So. 3d at 687.  "Rather, the State need only present evidence to show that the driver was legally impaired, the driver was operating the vehicle, and that the conduct of the driver contributed to the victim's death." *Jones*, 297 So. 3d at 687.  "For a decedent's conduct to constitute a defense to DUI manslaughter, the conduct must be viewed as the *sole proximate cause* of an accident." *Mizell v. State*, 350 So. 3d 97, 101 (Fla. 1st DCA 2022) (italics in original).

A trooper surveyed the scene of the crash, measured the tire marks on the road, and determined that the right front bumper of Juarez's car struck the left rear bumper of Unger's car.  (Respondent's Exhibit 8 at 431–47, 491–501)  The tire marks on the road demonstrated that Juarez did not apply the brake on his car before the crash.  (Respondent's Exhibit 8 at 426, 450)  This testimony by the trooper rebuts Juarez's proposed lay opinion that "the accident was not his fault."  (Respondent's Exhibit 18 at 3–4)  Because Juarez cannot demonstrate a reasonable probability that outcome at trial would change if he testified, the post-conviction court did not unreasonably deny the claim.  *Strickland*, 466 U.S. at 694.  Ground three is denied.

**Ground Four:**

Juarez asserts that trial counsel deficiently performed by not moving to strike Juror A. and Juror M.  (Doc. 1 at 8–9)  He contends that Juror A. was biased because he was both the president and the treasurer of an organization against drunk driving.  (Doc. 1 at 9)  He contends that Juror M. was biased because in the hallway outside the courtroom Unger showed pictures of her niece to Juror M.  (Doc. 1 at 9)

To satisfy *Strickland*'s prejudice prong, a Florida court requires a defendant to demonstrate that a juror served with "actual bias." *Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007) ("We therefore hold that where a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased."). "Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial — *i.e.*, that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." *Carratelli*, 961 So. 2d at 324.

"*Carratelli*'s actual bias test is arguably consistent with *Strickland*." *Owen v. Fla. Dep't Corrs.*, 686 F.3d 1181, 1201 (11th Cir. 2012). *See also Fennell v. Sec'y, Fla. Dep't Corrs.*, 582 F. App'x 828, 832–34 (11th Cir. 2014) (applying *Carratelli*'s actual bias standard when evaluating on federal habeas whether trial counsel deficiently performed by not moving to strike a juror for cause).

**Juror A.**

Juarez asserts that trial counsel deficiently performed by not moving to strike Juror A. (Doc. 1 at 8–9)  The post-conviction court denied the claim as follows (Respondent's Exhibit 19 at 2–3):

> [T]he Defendant claims that trial counsel was ineffective by allowing [a] biased juror[ ] on his jury panel. Specifically, the Defendant argues that a juror admitted he was president and treasurer of the Students Against Drunk Driving organization at his school. This juror stated that a prior experience that affected his school community where a school classmate was convicted of DUI manslaughter would not stop him from being fair. The juror further stated that he was the [ ] president and treasurer of SADD, but that this experience would not have a direct effect on his being a juror. The juror also stated that he

recognized jury service was a civic duty. . . . Therefore, this claim is denied.

During jury selection, Juror A. denied that his knowledge of his high school classmate's conviction for manslaughter while driving under the influence would affect his ability to act impartially (Respondent's Exhibit 8 at 50–51):

| [Prosecutor:] | Mr. [A.], did you have your hand up? |
|---|---|
| [Juror A.]: | Yes. I went to high school with — I was a little younger. He was about two years ahead of me [and] actually was convicted of DUI manslaughter. I wasn't close friends with the person, but I knew [ ] him. It was — it affected our school community pretty closely. I don't think that will affect my ability to hear the facts at all. |
| [Prosecutor:] | You said it affected your school community. In what way? |
| [Juror A.:] | It was — it's always difficult to hear of anyone in your community, friend or otherwise, to go through a hardship and everyone was aware of it. The faculty and all the students, we were keeping track. |
| [Prosecutor:] | So it was a topic of discussion? Talked about it a lot? |
| [Juror A.:] | Yes. |
| [Prosecutor:] | But the fact that that was a fairly recent occurrence and that it was a topic of discussion, that's not going to stop you from being fair in this case? |
| [Juror A.:] | No. |

Also, Juror A. denied that his earlier participation in Students Against Drunk Driving would affect his ability to act impartially (Respondent's Exhibit 8 at 152–53):

| [Trial counsel:] | Someone on this side of the room, anybody ever been or maybe is a current member of MADD, Mothers Against Drunk Driving, or Students Against Drunk Driving. Anybody ever had membership to that? Mr. [A.]. |
|---|---|
| [Juror A.:] | I was the vice president of SADD. |
| [Trial counsel:] | Of SADD? |
| [Juror A.:] | Yes. And treasurer. |
| [Trial counsel:] | And how long did that membership last? |
| [Juror A.:] | That was my sophomore year [as] treasurer and then junior I was — |
| [Trial counsel:] | Let me ask you, do you think holding that position would have any effect on you being a juror in this case? |
| [Juror A.:] | I don't think it will have a direct effect. It was more of [an] organization at school. It wasn't very robust. We had a pretty small membership, and I don't think it will affect me in any way other than having just facts and college in my background. |

Because Juror A. denied that his knowledge of his classmate's conviction and his participation in SADD would affect his ability to act impartially, a motion to strike Juror A. for cause would not succeed, and the post-conviction court did not unreasonably deny the claim. *Fleming v. State*, 366 So. 3d 1179, 1182 (Fla. 1st DCA 2023) ("A cause challenge is appropriate when a potential juror cannot be impartial. Prospective jurors must be excused if a reasonable doubt exists as to whether the juror possesses an impartial state of mind.") (citing § 913.03(10), Fla. Stat.)).

**Juror M.**

Juarez asserts that trial counsel deficiently performed by not moving to strike Juror M. (Doc. 1 at 8–9) The post-conviction court denied the claim as follows (Respondent's Exhibit 19 at 2–3):

> [T]he Defendant claims that trial counsel was ineffective by allowing [a] biased juror[ ] on his jury panel. . . . [T]he Defendant claims that [a] juror was observed sitting in a hallway outside the courtroom with a victim. The court questioned the victim, who testified that she talked about and was looking at pictures of her niece on her birthday with her mother-in-law, while a juror was present. Therefore, this claim is denied.

During jury selection, outside the presence of potential jurors, the trial judge asked Tara Unger about her conversation with Juror M. (Respondent's Exhibit 8 at 116–18):

> [Prosecutor #1:]    We were leaving the courtroom. I know there was one juror still out in the hallway. And then when Ms. Unger, the victim, came out in the hallway, she was sitting next to him for a moment and I don't know if she was going through pictures or something, but just —
>
> [Prosecutor #2:]    Not photographs of the crime scene or anything.
>
> [Trial counsel:]    That was on Mr. [M.]?
>
> [Prosecutor #2:]    Correct, Mr. [M.]
>
> [Prosecutor #1:]    If we could just —
>
> [Prosecutor #2:]    Just ask him if he —
>
> [Prosecutor #1:]    Ask him questions just to make sure.
>
> [Trial counsel:]    He was the last person, right?

| | |
|---|---|
| [Prosecutor #2:] | Tony asked him, you know, he just planted himself there. |
| [Court:] | What was she doing? |
| [Prosecutor #2:] | [W]as just leaving, Your Honor. |
| [Court:] | She was looking at pictures? |
| [Prosecutor #1:] | I don't know what she was doing. I honestly don't know what. But I would just like to clear it with the juror that he didn't see anything or hear. I don't know what the discussion was. |
| [Court:] | Did you ask what the discussion was? |
| [Prosecutor #2:] | No, I didn't, Your Honor. |
| [Court:] | Let me ask — |
| [Prosecutor #2:] | All right. |
| [Court:] | — Ms. Unger. Ms. Unger, not a big deal, but I need to inquire of you, when you were leaving, there was a juror out in the hallway who was waiting. You can sit down. You don't have to get up. |
| [Unger:] | Yes, Your Honor, there was a juror out in the hallway — |
| . . . | |
| [Court:] | Sorry, ma'am, go ahead. You can just sit and tell us. There was a juror there. We just need to make sure nothing was heard. |
| [Unger:] | There was a juror there. I wasn't sure that he was one of the jurors that were in here. |
| [Court:] | That's fine. |
| [Unger:] | And I was sitting next to him out there, and the only thing that we had talked about, my mother-in-law was showing me some photos of my niece on her birthday. |

| | |
|---|---|
| [Court:] | Okay. Did you all say anything that — |
| [Unger:] | No. That was it. |
| [Court:] | All right. Did you want to ask her any questions? |
| [Trial counsel:] | No, Your Honor. |
| [Court:] | Do you want me to bring in that juror or not? It's up to you. |
| [Trial counsel:] | Well, no, I don't think so, based on what Ms. Unger's represented. |

Because the record fails to demonstrate that Juror M.'s conversation with Unger about photographs of her niece affected Juror M.'s ability to act impartially, a motion to strike Juror M. would not succeed, and the post-conviction court did not unreasonably deny the claim. *Fleming*, 366 So. 3d at 1182 (citing § 913.03(10), Fla. Stat.)).  Ground four is denied.

**Ground Five:**

Juarez asserts that trial counsel deficiently performed by not obtaining a video recording that contained an interview of two persons who witnessed the crash. (Doc. 1 at 10)  He contends that a police officer told trial counsel and the prosecutor that the video recording existed, that trial counsel failed to obtain the video recording, and that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the video recording to the defense.  (Doc. 1 at 10)  The post-conviction court denied the claim as follows (Respondent's Exhibit 19 at 3) (state court record citations omitted):

[T]he Defendant claims that trial counsel was ineffective for fail[ing] to locate or discover a law enforcement videotape of a witness to the accident. The Defendant claims that Officer Kindervater testified that the State and defense counsel were both given information about the whereabouts of the tape, and that both were going to investigate it. At trial, defense counsel questioned Kindervater regarding his patrol vehicle, equipped with [ ] video and audio recording equipment. Kindervater testified he was not aware of the location of the videotape. Kindervater stated that he was unaware if the videotape was saved. Defense counsel thoroughly questioned Kindervater about the whereabouts of the videotape, and Kindervater stated that he was not certain if the tape still existed. Therefore, this claim is denied.

At trial, a police officer testified that he arrived at the scene of the crash in a police car equipped with a video camera (Respondent's Exhibit 8 at 288–90):

| [Trial counsel:] | Now, Officer, patrol vehicle — the patrol vehicles of the North Port Police Department are equipped with [ ] video and audio recording equipment, correct? |
| --- | --- |
| [Officer:] | Yes, sir, that is correct. |
| [Trial counsel:] | And your car is a patrol vehicle that you were driving that night, correct? |
| [Officer:] | Yes, sir. |
| [Trial counsel:] | So it was installed — it had installed in it the video and audio recording — |
| [Officer:] | Yes, sir. |
| [Trial counsel:] | — equipment? |
| [Officer:] | Yes, sir. |
| [Trial counsel:] | And the video equipment, it is a view frontwards over the hood in front of the windshield, correct? |
| [Officer:] | Yes, sir. |

| | |
|---|---|
| [Trial counsel:] | And the audio equipment can be used in conjunction with a microphone that's on the officer's person, correct? |
| [Officer:] | Yes, sir. |
| [Trial counsel:] | And that microphone, if a patrol vehicle, a patrol officer were to walk away some distance from the car, would still be recorded on the audio portion of the videotape, correct? |
| [Officer:] | Yes, sir. |
| [Trial counsel:] | When you arrived on the scene, you had your video and audio recording equipment running, correct? |
| [Officer:] | Yes, sir. |
| [Trial counsel:] | And it would be fair to say that on that video and audio recording, the images of the African American couple's vehicle would have been captured on that by the tape? |
| [Officer:] | Yes, sir. |
| [Trial counsel:] | And they themselves would have been captured on the tape, correct? |
| [Officer:] | Yes, sir. |

The officer denied knowing whether a video recording of the scene of the crash existed (Respondent's Exhibit 8 at 292–94):

| | |
|---|---|
| [Trial counsel:] | All right. It's fair to say that you do not know the location of that videotape that was running in your car that night? |
| [Officer:] | Yes, that's correct. |
| [Trial counsel:] | Okay. The tape was not saved, correct? |
| [Officer:] | I don't recall if the tape was saved for that particular incident, as I previously testified |

|  |  |  |
|---|---|---|
|  |  | in my deposition, I don't know if it's been saved. If that tape itself is saved or not, I don't know. |
| [Trial counsel:] |  | So you can't tell this jury where the location of the tape, the location of the tape is now, correct? |
| [Officer:] |  | That is correct. |
| . . . |  |  |
| [Trial counsel:] |  | So as far as you're concerned it's lost? |
| [Officer:] |  | I cannot say that it's lost or not because I may have put the tape in. That same tape may have another incident on it that [ ] may have happened later on during my patrol functions a couple days later. So that same tape may be in our evidence room. I don't know if it is or not. |
| [Trial counsel:] |  | Did you make any effort to look for it before coming to court today? |
| [Officer:] |  | No, sir. |

The officer clarified that, during his deposition, he explained how to retrieve the video recording from the evidence locker, if the video recording existed (Respondent's Exhibit 8 at 295):

|  |  |  |
|---|---|---|
| [Prosecutor:] |  | Okay. Did you give a deposition in this case? |
| [Officer:] |  | Yes, sir, I did. |
| [Prosecutor:] |  | And at that deposition did you explain to the defense attorney where that tape might be? |
| [Officer:] |  | Yes, sir, I did. |
| [Prosecutor:] |  | Okay. Tell us what you said at that time. |

| [Officer:] | I believe, without looking word for word in my previous printed deposition, I explained to the defense attorney what I just testified now, is that [the] tape may be [in] evidence, because to the best of my recollection at that time, I may have had an arrest a couple days after this particular incident which would have been captured on that same tape. That tape runs for a certain amount of time. So that tape may have this incident in it as well as my arrest incident all in the same tape [in] our evidence room, which I explained to the defense attorney. |
| --- | --- |
| [Prosecutor:] | Did you explain to the best of your knowledge how to gather that tape? |
| [Officer:] | Yes, sir. I explained to him who to contact, the North Port Police Department technician. |

Also, the officer clarified that the prosecutor agreed to search for the video recording in the evidence locker (Respondent's Exhibit 8 at 297–99):

| [Trial counsel:] | Now, that deposition, there was a discussion off the record with the State Attorney, the Assistant State Attorney, Ms. Fraivillig, you and me, correct? |
| --- | --- |
| [Officer:] | I believe that's what it states in the printout, yes. |
| [Trial counsel:] | And even off the record there was a discussion, correct? |
| [Officer:] | Yes, sir. |
| [Trial counsel:] | And you were going to look for that tape, correct? |
| [Officer:] | I don't believe that's what I recall saying to you. |
| [Trial counsel:] | And the State Attorney's Office was going to look for that tape, correct? |

[Officer:]            Actually, the best of my recollection, counselor, I believe you said you were going to contact the evidence technician.

[Trial counsel:]       So that's the best of your recollection, but the State Attorney's Office, you don't recall the State Attorney's Office ever saying that they were going to look for that tape as well?

[Officer:]            I believe Ms. Fraivillig did say that she was going to try to contact Pam Schmidt, I believe, she said.

[Trial counsel:]       And let me ask you this. The State Attorney's Office and law enforcement, they work together, correct?

[Officer:]            Yes, sir.

[Trial counsel:]       All right. The State Attorney's Office, they have access to evidence as part of their investigation, correct?

[Officer:]            Yes.

[Trial counsel:]       And you've met with the State Attorney before walking in here today regarding this case?

[Officer:]            Prior just to the trial starting, yes.

[Trial counsel:]       All right. Have you ever been asked by the State Attorney to go look for that tape before coming in here today?

[Officer:]            No, sir, I have not.

[Trial counsel:]       All right. And let me ask you this. You're not sure if that tape was put into evidence under some other evidence number, correct?

[Officer:]            I think what we're trying to confuse here is, I know that tape may have been put into evidence.

[Trial counsel:]        That's my question[ ], the keyword you just used, "may."

[Officer:]        Correct.

[Trial counsel:]        So that would indicate that you're not sure that it was put into evidence, correct?

[Officer:]        I cannot testify [ ] that particular incident is on that tape that is [in] evidence.

[Trial counsel:]        Okay. Well, let me ask you this. You're not even sure that a tape is in evidence, correct?

[Officer:]        With this particular incident, that's correct.

[Trial counsel:]        Okay. [Now,] my question is, you're not even sure it's under evidence in another case number, correct?

[Officer:]        I don't know. That's what I'm trying to testify to, counselor, I just don't know.

[Trial counsel:]        One thing you're sure of though, is that if the tape did still exist, it would have the image of the car, correct?

[Officer:]        Yes, sir.

[Trial counsel:]        And the image of the individuals on — that were near the car, the African American couple, correct?

[Officer:]        Yes, sir, it would.

[Trial counsel:]        Now, is it — would it be fair to say that whether that tape exists is wholly dependent upon you making a subsequent arrest in another case, correct?

[Officer:]        That is correct.

> [Trial counsel:]   So if you didn't make any other arrests
> after this incident, there would be no need
> for you to keep the tape, correct?
>
> [Officer:]   That is correct.

Because the record demonstrates that trial counsel investigated whether the video recording existed and that the police officer did not know whether the video recording existed, the record refutes Juarez's claim.  Also, because Juarez failed to submit with his motion for post-conviction relief either a copy of the video recording or a summary of the contents of the video recording (Respondent's Exhibit 18 at 8–10) and instead speculated that the video recording contained exculpatory evidence, the post-conviction court did not unreasonably deny the claim.  *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.").  Ground five is denied.

**Ground Six:**

Juarez asserts that trial counsel deficiently performed by not presenting testimony by expert witnesses to rebut the opinions by the prosecutor's expert witnesses.  (Doc. 1 at 11)  Juarez contends that an accident reconstruction expert would testify that Juarez did not solely cause the crash and that a toxicologist would testify that Juarez's blood alcohol content at the time of the crash was below the legal limit.  (Doc. 1 at 11)  The post-conviction court denied the claim as follows (Respondent's Exhibit 22 at 2):

> [T]he Defendant claims that trial counsel was ineffective for
> fail[ing] to call experts to refute the State's reconstructionist

> expert, crime lab analyst, alcohol lab specialist, or paramedic
> that drew blood from the Defendant at the scene. The evidence
> of Defendant's intoxication at the time of the vehicular crash
> was overwhelming. Therefore, this claim is denied.

Because Juarez failed to submit with his motion for post-conviction relief an affidavit or testimony by an expert who would rebut an opinion by a prosecutor's expert (Respondent's Exhibit 8 at 10–12) and instead speculated that an expert would testify in the manner that he contended, Juarez failed to demonstrate prejudice under *Strickland*. *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) ("This prejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because 'often allegations of what a witness would have testified to are largely speculative.'") (quoting *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980)).

Also, even if an accident reconstruction expert testified that Juarez did not solely cause the crash, "the driver's conduct need not be the sole cause of the victim's death to support a conviction for DUI manslaughter." *Jones*, 297 So. 3d at 687. "Rather, the State need only present evidence to show that the driver was legally impaired, the driver was operating the vehicle, and that the conduct of the driver contributed to the victim's death." *Jones*, 297 So. 3d at 687. Consequently, even if an accident reconstruction expert testified in the manner that Juarez contended, Juarez cannot demonstrate a reasonable probability that the outcome at trial would change. *Strickland*, 466 U.S. at 694.

Even if a toxicologist testified that Juarez's blood alcohol content at the time of the crash was below the legal limit, the prosecutor's toxicologist testified that

Juarez's blood contained an alcohol level between 0.124 and 0.125 and extrapolated that when the crash occurred Juarez's blood contained an alcohol level between 0.139 and 0.140.  (Respondent's Exhibit 8 at 583–84)  A highway patrol corporal testified that Juarez's breath smelled like an alcoholic beverage and that Juarez's eyes appeared watery and bloodshot.  (Respondent's Exhibit 8 at 511)  Also, the corporal observed an empty beer bottle, a broken beer bottle, and beer bottle caps in the front passenger seat of Juarez's car.  (Respondent's Exhibit 8 at 503)  A trooper, who administered a horizontal gaze nystagmus exercise to Juarez, observed nystagmus, or jerking of the eyes, which suggests intoxication.  (Respondent's 8 at 351–53)  Consequently, even if a toxicologist testified in the manner that Juarez contended, Juarez cannot demonstrate a reasonable probability that the outcome at trial would change, and the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694.  Ground six is denied.

**Ground Seven:**

Juarez asserts that cumulative error demonstrates his entitlement to relief. (Doc. 1 at 12)  Because no series of errors exists to accumulate, the cumulative-error claim is meritless.  *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Ground seven is denied.

## VI.  CONCLUSION

Juarez's application for the writ of habeas corpus (Doc. 1) is **DENIED**.  The clerk must enter a judgment against Juarez and **CLOSE** this case.

## DENIAL OF CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Because Juarez fails to demonstrate either a substantial showing of the denial of a constitutional right or that reasonable jurists would debate either the merits of the grounds or the procedural issues, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  Juarez must obtain permission from the court of appeals to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on July 17, 2024.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE